```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                      Norfolk Division

3

4  - - - - - - - - - - - - - - - - - -
                                     )
5    UNITED STATES OF AMERICA,        )
                                     )
6    v.                               )    CRIMINAL ACTION NO.
                                     )    2:25mj122
7                                     )
     FELICIA CHANTAL CRIQUE,          )
8                                     )
            Defendant.                )
9  - - - - - - - - - - - - - - - - - -    )


11                  TRANSCRIPT OF PROCEEDINGS
12
                       Norfolk, Virginia
13
                        July 1, 2025
14

15  BEFORE:
            THE HONORABLE ROBERT J. KRASK
16          United States Magistrate Judge

17
    APPEARANCES:
18

19          UNITED STATES ATTORNEY'S OFFICE
            By:  Joseph Kosky
20               Assistant United States Attorney
                 Counsel for the United States
21

22          FEDERAL PUBLIC DEFENDER'S OFFICE
            By:  Sean Mitchell
23               Assistant Federal Public Defender
                 Counsel for the Defendant
24

25
```

1          (Hearing commenced at 2:55 p.m.)

2          THE CLERK:  United States of America versus Felicia

3  Crique, case 2:25mj122.

4          Is the government ready to proceed?

5          MR. KOSKY:  The government is ready.

6          THE CLERK:  Is defense ready to proceed?

7          MR. MITCHELL:  Defense is ready.  Thank you, Your

8  Honor.

9          THE COURT:  Good afternoon.  Are we going to waive

10  an identity hearing today?

11          MR. MITCHELL:  Yes, Your Honor.

12          THE COURT:  Good afternoon.  Are you Felicia

13  Crique?

14          THE DEFENDANT:  Yes.

15          THE COURT:  And are you conceding that you are the

16  Felicia Crique who is named in the indictment filed in the

17  Eastern District of North Carolina?

18          THE DEFENDANT:  Yes.

19          THE COURT:  All right.  Thank you.  For the record,

20  then, the defendant has waived her right to an identity

21  hearing; she's admitted that she is the person so charged.

22  We will go forward with the detention hearing.

23          Before we do that, just one preliminary, is that I

24  will enter an order pursuant to the Due Process Protections

25  Act at this time.

1          We will start with the government.  You may proceed
2    by evidence or a proffer.
3          MR. KOSKY:  Your Honor, the government is going to
4    proceed by proffer.  The government's position is that there
5    is no condition or combination of conditions that will both
6    ensure the safety of the community and the defendant's
7    presence at future proceedings in the Eastern District of
8    North Carolina.
9          This case involves a large drug trafficking
10   conspiracy of which the defendant is a crucial component of.
11   This investigation, I'm not quite a hundred percent sure
12   when it began, but I know that the main co-conspirator,
13   Mr. Rudd, who is part of the indictment, one of Ms. Crique's
14   co-defendants, was arrested back in November of 2024 in the
15   Eastern District of North Carolina, and during that arrest,
16   large quantities of fentanyl and cocaine were seized from
17   the defendant's -- from Mr. Rudd's residence, as well as
18   three handguns, $10,000 in cash, a kilogram press, and
19   multiple flip phones and such and other, of course, obvious
20   indicators of drug trafficking activity.
21         Now, I believe Ms. Crique is the fiancée of
22   Mr. Rudd.  I believe they lived together at that time in
23   North Carolina.  More importantly, though, is Mr. Rudd was
24   detained at that time, and after -- thereafter, November
25   9th, November 10th, November 11th, and indeed over the next

1  several months, Ms. Crique was in constant communication

2  with Mr. Rudd over the prison phone system, and they

3  communicated both in code and in plain language about the

4  continued operations of this drug conspiracy.

5          On November 9th, the very day after the arrest,

6  there is a call between Rudd and Crique where Rudd indicates

7  that he doesn't have any drugs or cash, and he was going to

8  need Ms. Crique's help to continue the drug trafficking

9  business and that she would need to go out and continue to

10  interact with his customers.

11          There are other calls where Mr. Rudd directs

12  Ms. Crique to go and meet his source of supply so that they

13  can get more drugs, more cocaine and more fentanyl to

14  continue, again, this drug trafficking operation.

15          This proceeded again from November through the date

16  of Ms. Crique's arrest in North Carolina on state charges in

17  May, but before that, there were a couple of significant

18  events.  In February of 2025, Ms. Crique was encountered by

19  an undercover law enforcement officer in North Carolina in

20  which exchange for $600 of currency, U.S. currency, she

21  provided him 6.2 grams of fentanyl.  This transaction was

22  audio and video recorded, and I do have as an exhibit a

23  still shot from this video for the Court to look at.  I

24  showed a copy of this to Mr. Mitchell.

25          THE COURT:  Any objection, Mr. Mitchell?

1          MR. MITCHELL:  No, Your Honor.  I've seen it.

2          THE COURT:  Be received into evidence as Government

3     Exhibit Number 1.

4          (Government's Exhibit 1 received in evidence.)

5          MR. KOSKY:  Later in February there was another

6     attempted purchase of fentanyl from Ms. Crique, but

7     Ms. Crique apparently didn't recognize the undercover

8     officer as the same person who bought from her previously,

9     and she got, I guess, scared and decided not to go through

10    with the transaction.

11         In May of 2025, Ms. Crique was arrested in North

12    Carolina and several warrants were executed on various

13    properties.  I think most importantly, there was a storage

14    facility that was in the name of Ms. Crique in Elizabeth

15    City, North Carolina.  Located within that storage facility

16    were 88 grams of cocaine and 56 grams of fentanyl, and along

17    with some various pill bottles and other drug paraphernalia

18    in that storage facility.

19         Ms. Crique was arrested.  She was interviewed.  She

20    was provided her *Miranda* rights, and during her interview

21    after that arrest, she basically admitted to her role in the

22    drug trafficking organization.  She indicated that various

23    code words for cocaine and fentanyl that they had used

24    during their phone calls and that she was -- she took drugs

25    to the people she was instructed to.  She said she sold to

about five people, but it wasn't every day, and that when
drugs got low, she was instructed to go to some of the
co-conspirators to take care of various transactions and
receive more supply of drugs to further distribute to other
individuals.

Your Honor, those are the facts of the case that
the government would proffer to the Court in support of its
motion for detention.

THE COURT:  Thank you, Mr. Kosky.

Any evidence or proffer from the defense?

MR. MITCHELL:  Your Honor, nothing in the way of
evidence.  I would simply proffer that Mr. Watson, who was
interviewed by pretrial services, is present in support
of -- Mr. Watson, could you stand for the Judge.  Thank you.

He is present in support, Your Honor.

THE COURT:  Thanks.

MR. MITCHELL:  Then also, her long-time friend,
Ebony Oliver, is present as well.

Ms. Oliver, would you stand.

She is also in support.  She and Ms. Crique have
known each other all their lives.  That's all I have, Your
Honor, in the way of proffer.  I'll offer argument at the
appropriate time.

THE COURT:  Unless you have any objection to going
first, I will let you go first.  Mr. Kosky has the burden,

1   so I'll let him finish last.

2          MR. MITCHELL:  Yes, Your Honor.  Thank you.  Your

3   Honor, first of all, I would say that as far as the

4   allegations go and the recitation provided by the

5   government, what was striking to me is part of what was

6   described was my client being candid and cooperative when

7   being interviewed by law enforcement authorities, so I think

8   that's something that weighs in her favor and perhaps

9   foreshadows, you know, her desire to be on the straight and

10  narrow.

11         But looking specifically at these factors of

12  non-appearance and assessment of danger, and I reviewed the

13  pretrial services report in preparation for this, and, first

14  of all, as far as the non-appearance, Your Honor, there is a

15  lot of information in the report that weighs in my client's

16  favor.

17         For example, although the pretrial report correctly

18  indicates that she's been in the community for two months

19  and at the Portsmouth residence since May of 2025, the

20  reality is that she's lived in Portsmouth, Virginia, almost

21  her entire life.  She was only in North Carolina for

22  approximately a year, which is also included here.

23         The support that she has present indicates that she

24  has community ties.  Her father would be here but for his

25  own physical limitations, that's also described in the

pretrial services report, and that's significant because her

father is very sick, and she took care of him before she was

in custody, and so she's highly motivated to continue to

take care of him, to stay out of jail so that nothing

terrible happens to him and then she's in custody and can't

provide for him.  So that's a very strong motivator and

suggests a strong tie to the community.

Also, Your Honor, the pretrial report indicates a

history of failure to appear.  However, I don't read her

history that way.  She was never convicted of failure to

appear.  She was charged with it quite some time ago --

let's see -- and both of those charges were dismissed.

THE COURT:  Referring to the charges that are on

Page 6 of the report?

MR. MITCHELL:  Yes, Your Honor.  From 2007, so

almost 18 years ago, is when she was charged with not

appearing before a court as required.  Certainly, what you

see is that at least one required court appearance in

Hampton for a traffic-related misdemeanor.  No suggestions

of failing to appear.  So I'd suggest to the Court that she

has no history of failure to appear.

With respect to what's listed second, the history

of probation non-compliance, it is accurate to say that when

my client was a youth, and she was on probation, let's see,

I believe that first time age 13 for an assault and battery

conviction, the disposition column does reflect a violation

of probation in 2002, so that's 23 years ago, and then on

Page 5, with respect to, let's see, discharge of a firearm,

destruction of property and threaten bodily harm, probation

revocation listed there 2008, so 17 years ago.

However, Your Honor, I think what's most notable is

what happened more recently, albeit that was a long time ago

as well, in 2008, she was convicted in Portsmouth, and she

was placed on supervised probation, and she completed that

probation without any revocations.

So the age crime curve, as I'm sure that Your Honor

is aware, speaks a lot about the development or I guess the

lack thereof of the brain for youth when they are between

the ages of 18 and 25 and how impulsivity and recklessness

and all those other things are hallmarks of some people at

that age. But I would suggest that it appears that she's

aged out of that, and I'll speak more to that when I address

assessment of danger.

The third item listed is lack of verifiable or

legitimate employment. Again, Mr. Watson is present. He

was interviewed, and he verified her employment at New Wave

Construction so she has a job to go to if this Court

releases her. She also has the possibility of a second job,

Gordon Home Health, which was also verified by pretrial

services, verified in the sense that she worked for them.

1          THE COURT:  Let me ask you about Mr. Watson since

2    he's here.

3          MR. MITCHELL:  Yes, Your Honor.

4          THE COURT:  The report -- maybe I missed it.  Does

5    it say he's offered her a job to go back to painting?

6    Because it references Gordon Home Health, but I didn't --

7    maybe I missed it.

8          MR. MITCHELL:  Your Honor, may I have Mr. Watson

9    speak to that?

10          THE COURT:  Sure.

11          MR. MITCHELL:  Mr. Watson, please join me up front.

12          THE COURT:  You can just stay right at the podium

13    there.  Are you intending to re-hire Ms. Crique if she's

14    released?

15          MR. WATSON:  Yes, sir.

16          THE COURT:  Okay.  Thank you.

17          MR. MITCHELL:  And, Your Honor, so I would suggest

18    to the Court that she has a job to return to, and pretrial

19    services was able to confirm at least prior employment with

20    Gordon's Home Healthcare, and I would say that Ms. Crique is

21    very interested in attempting to try to get a job back there

22    as well.  So two forms of employment, two sources of

23    employment.

24          With respect to the unexplained assets, I'm not

25    quite sure how that plays a part in an assessment of her

1  non-appearance, and I'm not quite sure what those

2  unexplained assets would be. I can't tell that she was

3  asked very specifically about any of her assets. There are

4  three vehicles here that seem to have some age to them.

5          Nevertheless, Your Honor, on balance with all of

6  those things, she has significant ties to the community, and

7  she has not demonstrated that she will not appear in court

8  if required.

9          With respect to the assessment of danger, I will

10 say that the nature of the instant offenses, yes,

11 absolutely, drugs and guns and drugs of this type are

12 serious. I did review the indictment. Much of what the

13 government spoke to talked, I think, a little bit more about

14 Mr. Rudd's seriousness, and a review in the indictment shows

15 that. I mean, most of the drug weights and anything related

16 to guns aren't connected to Ms. Crique. They are connected

17 or attributed to Mr. Rudd and the other male co-defendant.

18         THE COURT: So I thought there's one count, it's

19 count five, which puts her with 40 grams or more of a

20 mixture and substance containing fentanyl as of May, which

21 obviously, if proven, and the weight's established, that

22 would trigger a five-year mandatory minimum.

23         MR. MITCHELL: Yes, Your Honor, that's correct.

24 And I was only pointing out that in comparison with

25 Mr. Rudd, that the drug weights are much higher for Mr. Rudd

1    as well as the other male co-defendant.  The three male --

2    excuse me, female co-defendants are attributed with

3    approximately the 40 grams, but there isn't anything that

4    identifies, for example, any of the firearms that are

5    listed.

6           THE COURT:  She's not charged with a firearm

7    offense.  I note that.  I guess the indictment does indicate

8    that it was seized, the firearm and ammunition was seized

9    from a vehicle occupied allegedly by Mr. Rudd and Ms. Crique

10   on November 8th.

11          MR. MITCHELL:  Yes, Your Honor.  And at least --

12   and I think at least one or two other folks in the vehicle.

13   And also Mr. Kosky brought up the storage facility and items

14   that were found there there in North Carolina.  You know,

15   Ms. Crique is going to be as far as possible away from

16   Mr. Rudd during the pendency of this case, and she's not

17   going back to North Carolina except to appear in court as

18   required, and so her residence here is a safe one, and I

19   argue that she's demonstrated that she's not a risk of

20   non-appearance.

21          As to the danger, as I mentioned, part of what was

22   mentioned in the government's proffer suggests some

23   cooperation on her part or at least in communicating very

24   early on with the authorities when interviewed about what

25   role perhaps she played.

1          Now, I haven't vetted that evidence.  I haven't

2     seen that evidence.  Today's the first time I'm hearing of

3     it, so I can't speak to whether there are any constitutional

4     challenges to those.  But I think it's noteworthy that it

5     suggests cooperation or compliance on her part.

6          With respect to the substance abuse history, that's

7     listed as a danger at risk.  So the pretrial report

8     references marijuana use, consistent in recent marijuana

9     use.  It references cocaine at the beginning of 2025.  But,

10    Your Honor, both of those things can be managed if she's

11    under the watchful eye of U.S. Probation and Pretrial

12    Services, with drug treatment, with random urinalysis, and

13    things of that sort.

14         So there are conditions that this Court could

15    fashion to address any risk as far as that.  The history of

16    criminal activity, while under supervision, it appears that

17    her probation was revoked when she was convicted of the

18    assault on law enforcement crimes.  But other than that,

19    again, she successfully completed the supervised probation

20    when she was released from prison.  She did prison time for

21    those convictions, and when she got out, she was compliant.

22    And, again, she was a little bit older then, so I suggest

23    that that played a part, and also what is relevant is that,

24    you know, context matters.  These convictions were 17 years

25    ago.

1          Lastly, Your Honor, it speaks to criminal history

2     to include violent behavior and history.  So these offenses

3     are assaultive in nature, but, again, I reiterate that

4     they're aged, that they are quite some time ago.  We don't

5     know the details, for example, of this assault and battery

6     juvenile adjudication from age 13, and assault and battery

7     is an unlawful offense of touching.  It could have been a

8     push.  It could have been a shove.  We don't know the

9     circumstances, and the information regarding the nature of

10    those violations is not available.

11          So for all of those reasons, Your Honor, the

12    defense argues that there are certain conditions that this

13    Court could fashion that would ensure her compliance and

14    also ensure the safety of the community.

15          THE COURT:  Thank you, Mr. Mitchell.

16          MR. MITCHELL:  Thank you, Your Honor.

17          THE COURT:  Mr. Kosky, what do you say?

18          MR. KOSKY:  Thank you, Your Honor.  We obviously

19    disagree.  We think that there are no conditions or

20    combination of conditions that can assure the appearance of

21    the defendant and the safety of the community in this case,

22    and I would start, of course, by suggesting to the Court

23    that this is a presumption case.  There is a presumption in

24    favor of detention, and it's up to Ms. Crique to rebut that

25    presumption, and I don't think anything that has been

1   presented to the Court so far rebuts that presumption.

2          I'll start with the risk of flight or

3   non-appearance, and I know that Mr. Mitchell did a good job

4   of highlighting Ms. Crique's connections to here, the

5   Eastern District of Virginia, but this is an Eastern

6   District of North Carolina case, and it certainly is

7   concerning that the moment or shortly after the time when

8   Ms. Crique was arrested on these state charges in North

9   Carolina, that she found herself here in the Eastern

10  District of Virginia.

11         Now, I don't know what her intent was.  I know that

12  her conditions did not restrict her travel to Virginia.  She

13  was -- when she was released on North Carolina bond, there

14  was no travel restriction in place, but, nonetheless, here

15  we find ourselves in Virginia when Ms. Crique is facing

16  charges in North Carolina.

17         THE COURT:  So let me just understand.  Are you

18  saying that when she was arrested, was she charged in state

19  court --

20         MR. KOSKY:  Yes.

21         THE COURT:  -- and released on a bond in North

22  Carolina?

23         MR. KOSKY:  That's correct, Judge.  She was

24  released on a bond.  There was no condition --

25         THE COURT:  Where was the charge brought?  Do you

1    know?  In Elizabeth City?

2              MR. KOSKY:  Camden County, Judge.

3              THE COURT:  Okay.  Thank you.

4              MR. KOSKY:  And so it is concerning to the

5    government that she did come here.  It's also concerning

6    that, as Mr. Mitchell points out, that most of her life she

7    has spent here in Virginia except for the last several years

8    in North Carolina, which apparently corresponds with her

9    involvement in running this drug enterprise.

10             So her involvement and her ties to North Carolina

11   really rest on her cooperation and her participation in an

12   illegal drug trafficking enterprise.  So I think those are

13   certainly things that the Court needs to be concerned about

14   as it relates to Ms. Crique's future appearances in federal

15   court or even state court, for that matter.

16             As it relates to the dangerousness of Ms. Crique,

17   again, I don't think there is any condition or combination

18   of conditions that can assure the safety of the community,

19   and obviously because this is a presumption offense, the

20   reason for that is because drug trafficking is such a

21   dangerous enterprise.  And in this case we have not only

22   cocaine but we have fentanyl, which is one of the most

23   dangerous drugs out there that caused all kinds of overdoses

24   and deaths in our community.

25             So I think that Ms. Crique's participation in that

1    is, you know -- it alludes to the dangerousness of what we
2    have going on here.  And I think it's even more dangerous
3    because the fact of the matter is her fiance, Mr. Rudd, was
4    arrested in November, and instead of that being a wake-up
5    call for Ms. Crique to say I can't be involved in this
6    anymore, she basically ran the operation in his place.  So
7    while he's in custody, she is taking his orders, she is
8    taking his direction, and she's continuing to distribute
9    fentanyl and cocaine in his place.

10            I think that speaks volumes to the dangerousness of
11   Ms. Crique.  I think that speaks volumes to the fact that we
12   can't trust her on supervised -- or any kind of supervised
13   release or any kind of bond or conditions because ultimately
14   someone has to want to obey the law and obey the conditions
15   of the Court, and I think when something is as -- like that,
16   that a person gets arrested, most people would say, okay,
17   the gig is up, you know, we've been caught.  Ms. Crique says
18   the exact opposite.  She doubles down and continues the drug
19   trafficking organization, and I think that speaks volumes,
20   again, to what the Court can expect if Ms. Crique is
21   released on bond.  I don't think that arrests deter her like
22   they might a normal person.

23            The Court also looks at the weight of the evidence,
24   and I think the weight of the evidence against Ms. Crique is
25   overwhelming, frankly.  We have her own statements.  We have

1  her on recorded drug distribution transactions, and, of
2  course, we have drugs that were found in the search of her
3  storage facility.

4          If we look at her history and her characteristics,
5  I know Mr. Mitchell has said that many of these things are
6  old, but I do want to invite the Court's attention to a
7  couple of things.  She has two probation violation
8  convictions, and what is probation but conditions of the
9  Court that she is supposed to follow.  And twice before in
10  2008, when she was much younger, of course, she violated
11  conditions of the Court.

12          So, again, the Court has to look and think, can it
13  fashion any conditions that Ms. Crique is actually going to
14  follow?  And I think when you add it all up, I just don't
15  think the Court can have that kind of trust and faith that
16  Ms. Crique will follow along and will follow conditions that
17  this Court could impose upon her.

18          It's a five-year mandatory minimum, as the Court
19  pointed out.  That's a serious amount of time.  That alone
20  could provide an incentive for Ms. Crique to flee, and I
21  think when you add it all up, I just don't think there is
22  any condition or combination of conditions that the Court
23  could impose, so we would ask that she be detained pending
24  further proceedings in this matter.

25          THE COURT:  Thank you.

1          MR. KOSKY:  Thank you.

2          THE COURT:  Mr. Mitchell, did you want to talk upon

3    any of that?  You don't have to, but I'll give you the

4    opportunity.

5          MR. MITCHELL:  Just briefly, Your Honor.  Thank

6    you.

7          Your Honor, I just want to say that we all

8    recognize the dangerous offense.  However, the abrogation

9    there, it can't be an automatic trigger to detention in

10   every case to bring up overdoses and the death that's

11   associated with it.  It is absolutely dangerous.  That's why

12   she is facing a five-year mandatory minimum.  That's why

13   she's in custody at this point.  But that shouldn't be an

14   automatic trigger to a denial of detention.

15         Additionally, with respect to her having been on

16   probation, again, I make the point, she was on probation.

17   The most recent time she was on probation, she complied.  So

18   to the extent that compliance with probation is

19   foreshadowing as to whether she can follow the Court's

20   rules, the last time she was on probation, she did just

21   that, and the probation was successfully ended.

22         Also, Your Honor, she was one state away.  You

23   know, the fact that she was on -- she had charges in state

24   court in North Carolina, there certainly aren't any charges

25   on her failing to appear for those state court matters.

1    That information will be in the pretrial services report,
2    and in terms of her coming to Virginia when those charges
3    were filed, or what have you, she was hiding in plain sight,
4    I guess.  She was at her dad's house.  So I don't think that
5    that should be given the weight that's being suggested.  And
6    lastly, the pretrial services report points out that she
7    doesn't have a passport.  She hasn't traveled
8    internationally.  She's not attempting to flee these
9    charges, Your Honor.  Thank you.
10          THE COURT:  All right.  Thank you.  I'll just start
11   out right upfront.  I don't think flight is a reason to
12   detain in this case.  I think there are conditions I could
13   set that would mitigate reasonably any risk of flight, so
14   I'm not going to detain her based on flight concerns.
15          I do think it is appropriate to detain based on
16   dangerousness concerns.  I don't think there are conditions
17   that I might set.  I'll briefly discuss that.  First, the
18   charges follow are very serious.  The fact that Mr. Rudd may
19   have more drug weight allegedly, you know, that he's a
20   criminal four doesn't mean that the charges against
21   Ms. Crique are not serious.  They are very serious, and the
22   weight of the evidence at this preliminary phase of the case
23   does appear to be substantial, particularly the seizure,
24   allegedly, of narcotics from her storage facility and the
25   statements that she allegedly made to investigators about

her role in the conspiracy, are very damaging to her ability
to successfully defend against these charges.

With respect to her history and characteristics,
it's a mixed bag. There is good and bad. She's got a
father who has offered to take her in. He seems like a
suitable third-party custodian. She's got Mr. Watson who
has offered to employ her. He's employed her in the past
for a significant period of time. He's taken the trouble to
come here today to support her. That's all good.

She certainly hasn't lost any ties to this
community. I don't -- frankly, the difference between
southeastern Virginia and northeastern North Carolina isn't
that substantial, so I don't think that there is any concern
about her crossing state lines that leads to any conclusions
here today.

I would note she doesn't have any history of recent
employment. There is this issue about whether or not she
would be working for Gordon Home Health and some disparity
there, but I don't know that that is terribly significant to
what we are doing here today. There is at least the
suggestion that she provided some information to Ms. Pitman
that when Ms. Pitman tried to verify, that the people at
Gordon Home Health couldn't verify. They didn't know that
she was coming back to work, at least the person she spoke
with. So I don't know what to make of that, but it is

1    somewhat concerning.

2          Her criminal history, it's concerning.

3    Mr. Mitchell is right, it's mostly old, but the point is

4    that she's now age 37, and she committed these crimes when

5    she was young, and her judgment wasn't as well formed as it

6    should be now.  The question is why are we here today with

7    her under indictment and her engaging in this conduct?  So

8    I'm not presuming that she is guilty of anything, but it

9    certainly raises the concern that she hasn't yet learned

10   that crime doesn't pay, and there are consequences for

11   committing crimes.

12         Also, somewhat concerning but, again, it is old,

13   and I take Mr. Mitchell's point, I think it's development

14   that these prior probation violations, they date back almost

15   17 years.  There is three of them, not two.  But they go way

16   back, and I don't know that they tell us that much about

17   whether she would follow release conditions now.

18         What that tells me more is the fact that Mr. Rudd

19   is arrested in November and that Ms. Crique doesn't make the

20   decisions that her prior exposure to the criminal justice

21   system, hopefully, would cause her to make, which is, hey, I

22   need to get out of this, I'm in trouble, and I'm going to

23   stop, and I'm going to disassociate myself from Mr. Rudd.

24   Apparently, he was arrested with a gun and drugs, and back

25   in November, and now I'm not going to be further involved

with him.  Perfect time to part ways, come to Virginia, get
a fresh start with her father, seek employment, take care of
her father, do those things.

           The evidence before the Court is that she did
precisely the opposite; that she doubled down on the same
conduct engaged and continued jail calls with Mr. Rudd,
continued to carry forth the operation that the two of them
were jointly participating in, much of it with some others,
prior to Mr. Rudd's arrest.

           She's involved in an undercover sale.  We've got
audio, apparently, and video.  I've got a picture here,
Government's Exhibit 1, of her making a sale of fentanyl,
which is very dangerous to the community at large.  And then
we have her arrest in May, and we have this storage facility
that's linked to her in which there are significant volumes
of fentanyl and cocaine found along with drug paraphernalia.
We've got her statements, you know, admitting what she's
done.

           While Mr. Mitchell would suggest that I should take
those statements to mean that she is turning over a new
leaf, and I certainly hope that's the case, I can't ignore
what happened between November and May, and for that reason
I find that she does present a serious danger to the
community, which is enhanced by her history of substance
abuse, which is longstanding, and I do find that there are

1  no conditions that I might reasonably set that would

2  reasonably assure the safety of the community or persons.

3  So I order Ms. Crique detained pending further proceedings

4  in the case, and I'll issue an order to that effect.

5          Is there anything further we need do in

6  Ms. Crique's case today?

7          MR. KOSKY:  No, Your Honor.  Thank you.

8          MR. MITCHELL:  No, Your Honor.

9          THE COURT:  She is remanded to the custody of the

10 U.S. Marshals, and she will, I assume, be transported

11 forthwith to the Eastern District of North Carolina for

12 disposition of her case there, and I assume she will be

13 requesting court-appointed counsel there; is that correct?

14         MR. MITCHELL:  Your Honor, yes.

15         THE COURT:  Yes.  Thank you, Ms. Crique.

16         I will enter an order of commitment directing the

17 marshals to transport her there as soon as possible.

18         The Court will be in recess.  Thank you, everyone.

19         (Hearing adjourned at 3:25 p.m.)

20

21

22

23

24

25

```
 1                         CERTIFICATION

 2

 3          I certify that the foregoing is a correct

 4    transcript, to the best of my ability, of the court's audio

 5    recording of proceedings in the above-entitled matter.

 6

 7            X_____/s/_____x

 8                         Jody A. Stewart

 9            X_____9-4-2025 _____x

10                            Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```